**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| SECONDARY LIFE THREE LLC, | No. 21-cv-20-MAR |
| Plaintiff, | |
| vs. | **ORDER** |
| TRANSAMERICA LIFE INSURANCE COMPANY, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

Page

I. INTRODUCTION.................................................................3

II. SUMMARY JUDGMENT STANDARD .................................................3

III. RELEVANT BACKGROUND .............................................................5

IV. THE PARTIES' POSITIONS ...........................................................10

V. DISCUSSION..................................................................10

    A. Choice of Law.................................................................10

    B. The Parties' Substantive Arguments ...........................................13

        1. Whether the Statute of Limitations Bars SL3's Claims ............14

        2. Texas Rules of Contract Interpretation ...............................17

Case 1:21-cv-00020-MAR   Document 73   Filed 12/08/21   Page 1 of 48

3.     Lebbin v. Transamerica Life Ins. Co., *No. 20-11756, 2021 WL 3278166 (11th Cir. Aug. 2, 2021) (per curiam) and Other Non-binding Precedent* ........................................................**20**

a.     *The Parties' Arguments* ...........................................**21**

b.     *Whether the Court can Consider* Lebbin *when Deciding this Case* ...............................................................**22**

i.     *Citation to Unpublished Cases and Cases from Other Jurisdictions* ................................................**22**

ii.     *Whether Texas and Florida Have Different Rules of Contract Interpretation* ..................................**25**

4.     *Whether SL3 Seeks Reformation of the Policy* ......................**30**

5.     *Whether the Policy is Ambiguous* .......................................**30**

a.     *Maturity Date* ......................................................**31**

b.     *Joint Equal Age and Joint Equal Age 100* ..................**38**

i.     *Adjusted* ....................................................**39**

ii.     *Equal* ........................................................**43**

iii.     *Conclusion* ................................................**44**

c.     *"Never-heard-of" and "Unusual" Terms* ...................**44**

d.     *Cash Value and Accumulation Value* ........................**45**

C.     *Effect of the Court's Findings on SL3's Partial Motion for Summary Judgment* ......................................................................**46**

VI.     CONCLUSION ................................................................**47**

2

# I. INTRODUCTION

Before me is a Motion for Summary Judgment filed by Defendant/Counterclaimant Transamerica Life Insurance Company ("Transamerica"). (Doc. 56.) Plaintiff/Counterclaim Defendant Secondary Life Three L.L.C. ("SL3") filed a timely Resistance to Transamerica's Motion for Summary Judgment. (Doc. 65.) Transamerica filed a timely Reply to SL3's Resistance to Motion for Summary Judgment. (Doc. 66.)

Also before me is a Motion for Partial Summary Judgment filed by Plaintiff/Counterclaim Defendant SL3. (Doc. 57.) Transamerica filed a timely Resistance to SL3's Motion for Partial Summary Judgment. (Doc. 59.) SL3 filed a timely Reply in Support of its Motion for Partial Summary Judgment. (Doc. 67.) I heard arguments on both motions on September 29, 2021. (Doc. 71.)

Pursuant to the parties' consent to a Magistrate Judge (Doc. 38) and the Scheduling Order (Doc. 42), the parties consented to disposition by a United States Magistrate Judge and the case was subsequently assigned to me. *See* 28 U.S.C. § 636(c)(3).

# II. SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. "An issue of material fact is genuine if it has a real basis in the record,"

Case 1:21-cv-00020-MAR   Document 73   Filed 12/08/21   Page 3 of 48

*Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing M*atsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. Daimler Chrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248)). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable or is not significantly probative," *Anderson*, 477 U.S. at 249–50 (internal citation omitted), does not make an issue of material fact genuine. Put another way, "'[e]vidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (citation omitted).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citations omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* at 910–11. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322-23.

In determining if a genuine issue of material fact is present, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, the court must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, because the court views "the facts in the light most favorable to the non-moving party, [the court does] not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## III.    RELEVANT BACKGROUND

This case involves the interpretation of a $1,000,000 Joint and Last Survivor Adjustable Life Insurance Policy ("the policy") issued on the lives of Ben J. and Betty L. Barnett (alternately, "the insureds," "the Barnetts," "Ben," and "Betty"). (Doc. 56-3 at 1.)[1] Robert Arnold Barnett, trustee of the Ben J. Barnett and Betty L. Barnett Life Insurance Trust was listed as the owner of the policy. (*Id.* at 3.) The policy became effective on January 27, 1994. Although both Ben and Betty were 70-years-old on January 27, 1994, the policy was "issued at a speci[a]l class joint equal age 74."[2] (*Id.* at

---

[1] It is the Court's usual practice to cite to the ECF-assigned electronic page numbers at the bottom of exhibit pages, which are often different from the page numbers originally assigned by the parties. However, the electronic page numbers in Transamerica's Appendix (which is divided into two parts, Doc. 56-3 and Doc. 56-4) and SL3's Appendix, which is also divided into two parts (Doc. 57-4 and Doc. 61-3) are often incomprehensible due to various footers and watermarks contained in the original documents that obstruct the ECF numbers. Therefore, I will use the original appendix page numbers combined with the Court's docket number when citing to pages in the parties' appendices, i.e., (Doc. 56-3 at 141). Transamerica's original page numbers appear in the center of the pages in red and are marked as "APP. 1," "APP. 2," etc. SL3's original page numbers appear in the lower right hand corner of the page under the ECF information in all capital letters as "PAGE 1," "PAGE 2," etc.

[2] The Application Amendment quoted above contains a typographical error. The letter "a" is missing from the word "special." (*Id.* at 22.) This has no effect on the meaning of the phrase

3, 22, 25-26) (capitalization omitted).)  On February 3, 1994, Ben, Betty, and Robert Barnett all signed an addendum acknowledging this fact.  (*Id.* at 22.)  The declarations page is the first page of a three-page "Policy Data" section of the policy and lists the policy maturity date in all capital letters as follows: "POLICY ANNIVERSARY DATE NEAREST THE INSUREDS' JOINT EQUAL AGE OF 100." (*Id.* at 3.)

> The Definitions section of the policy provides the following relevant definitions:
>
> Joint Equal Age means the adjusted age of a male and a female insured which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status.
>
> .   .   .
>
> Cash Value means the accumulation value as described in the Accumulation Values section, less any surrender penalty
>
> .   .   .
>
> The Maturity Date is the policy anniversary nearest the Insureds' Joint Equal Age 100.
>
> .   .   .
>
> We will use the Policy Date shown in the policy data to determine the monthly dates, policy anniversaries and policy years.

(*Id.* at 8.)  The "Policy Date" is listed as January 27, 1994.  (*Id.*)  The Policy Data section also provides a "Table of Annualized Guaranteed Monthly Deduction Rates per $1,000." (*Id.* at 5 (all capitalization omitted).)  The table begins with "Policy year beginning Jan. 27, 1994" and ends with "Policy year beginning Jan. 27, 2019." (*Id.*)

This is a "second-to-die policy," which means the policy paid "the death benefit to the Beneficiary if both Joint Insureds die before the Maturity Date." (*Id.* at 2.) However, if "both or either Joint Insured [was] living at the Maturity Date," the policy only paid the net cash value, if any.  (*Id.*)  The policy terminated "at the earliest of" four

---

"special class joint equal age of 74."  Whether the phrase is ambiguous or not does not turn on that missing letter because in context it is obvious the word is "special."  I will not repeat this typographical error throughout this order.

occurrences, only of which is relevant to this dispute: "the Maturity Date." (*Id.* at 20.) The policy was signed and issued in Texas where the Barnetts were domiciled.

Ben Barnett died on July 14, 2008. (Doc. 66-1 at 5 ¶ 9.) After Ben's death, Betty and Robert Barnett decided to sell the policy on the secondary life insurance market through a life settlement broker.[3]

Plaintiff SL3 purchased the policy in 2011 for $610,150, which reimbursed the Barnetts for their premium payments and covered additional fees. (*Id.* at 6 ¶12; ) SL3 used Secondary Life Capital, LLC ("SLC"), a life settlement provider, and The Peninsula Group ("Peninsula"), a life settlement provider and producer, to administer its life insurance policies. (Doc. 56-2 at 3 ¶ 7; Doc. 61 at 4 ¶ 7.) Welcome Funds acted as broker for the Barnett family for the purchase. (Doc. 56-3 at 53.) Betty Barnett was 86 when SL3 purchased the policy. (Doc. 66-1 at 6 ¶12.) Prior to purchasing the policy, SL3 studied life expectancy reports for Betty Barnett. (Doc. 56-3 at 62-63.) Tya Grant Coldiron, COO of the Peninsula, stated that the life expectancy reports "are how [they] would have valued the policy and determined if it was a policy an investor was interested

---

[3]     Texas law defines a life settlement contract as "a written agreement entered into between a provider and an owner establishing the terms under which compensation or anything of value will be paid and is less than the expected death benefit of the insurance policy, in return for the owner's assignment, transfer, devise, or bequest of the death benefit or a portion of an insurance policy or certificate of insurance for compensation. . . ." [Tex. Ins. Code Ann. § 1111A(11).] In more simple terms, a life settlement is a contract between an insured and a purchaser whereby the purchaser buys the right to the proceeds of a life insurance policy for an amount less than the policy's face value but greater than the policy's cash surrender value. [*See id.*]

Athena Ponce, *What are Life Settlements?* De Leon & Washburn, P.C. Attorneys at Law, LEGAL BLOG (Nov. 5, 2012) (ellipses in original) (original footnote citations embedded into text), https://www.dwlawtx.com/2012/11/05/what-are-life-settlements/ (last visited Nov. 23, 2021).

in[]" and that the policy terms were not as important to SL3 as the life expectancy analysis. (*Id.* at 62.) The life expectancy analysis projected Betty Barnett's life expectancy was six years from the date of the February 1, 2011 report, i.e., February 2017. (*Id.*) Ms. Coldiron did not recall any conversations about the maturity date in the policy or about the joint equal age term in the policy prior to SL3's acquisition of the policy. (*Id.* at 61.)

On January 27, 2012, Transamerica sent SL3 a "Statement of Policy Value" stating, among other things, that the Policy Outlook was based on the assumption that SL3 paid the annual policy premium "for the life of the policy or to age 100, whichever comes first" that "[b]ased on . . . current rate assumptions, your policy would remain in force until your policy anniversary date in January 2020. At that time, your policy would mature for its net cash value." (Doc. 56-4 at 206.) Transamerica sent SL3 the same Statement of Policy Value on January 28, 2013; January 27, 2014; January 29, 2018; and January 28, 2019. (*Id.* at 208, 210, 212, 2014.)

On December 17, 2019, Transamerica sent SL3 a letter stating the following:

> We are writing to remind you that your policy will reach maturity on January 27, 2020. According to the terms of the policy, if the policy matures, you will receive a benefit payment of $6,021.99, and the policy and all coverage under it will terminate. If you wish to continue life insurance coverage we are allowing you a one-time opportunity to exchange your maturing policy for one that will not mature until the policy anniversary nearest the Insured's age 121.

> If you choose to exchange your maturing policy, we will apply its value to a new . . . coverage in the amount of $6,975.00. Under the new policy, we would pay the death benefit to the currently named Beneficiary (or any other Beneficiary you designate) if the Insured dies before the new policy will mature. If the Insured is still living on the policy anniversary date nearest their 121st birthday, this new policy would also mature, and we would pay the net cash value, if any, to the Owner.

. . .

> If we do not hear from you by January 17, 2020, we will close our files
> and we will assume you wish to allow the policy to mature and the check
> will be mailed.

(*Id.* at 202.) On January 28, 2020, Transamerica sent SL3 a check for $23,787.20.[4] (*Id.* at 216.) Betty Burnett died on April 5, 2020 at age 96. On October 1, 2020, SL3 filed suit in the Central District of California. (Doc. 1.) On March 1, 2021, venue was transferred to this Court. (*Id.*) On June 14, 2021, SL3 filed its First Amended Complaint, which contains two claims. (Doc. 50.) One claim is for breach of contract for canceling coverage before Betty Barnett reached age 100 and prior to her death, resulting in a $1,000,000 loss. (*Id.* at 4.) SL3's second claim is for declaratory relief that there is an existing controversy between the parties concerning the policy and that SL3 is entitled to a declaration that the policy remained in full force and effect at the time of Betty Barnett's death. (*Id.* at 5.)[5] Along with its amended answer, Transamerica filed its counterclaim for declaratory relief asking the Court for "a declaration that Transamerica properly administered and otherwise performed the Policy at issue and does not owe SL3 any additional benefits under the terms of said Policy." (Doc. 53 at 12.) Transamerica's counterclaim was identical to its original counterclaim, docketed at ECF 28. (*Id.* at 1 n.1.) Transamerica stated that SL3's answer to the original counterclaim, docketed at ECF 36, would suffice and that no further response was "expected or requested." (*Id.*)

---

[4] SL3 originally stated it did not know how this amount was calculated. (Doc. 56-3 at 224 (Tya Coldiron Jan. 30, 2020 email).) At the hearing, SL3 stated that the amount represents the $6,021.99 cash value payment plus reimbursement of one premium payment.

[5] SL3's Motion for Partial Summary Judgment seeks an order that the "policy does not provide for cancelation, termination, or other forfeiture of death benefits prior to one of the insureds reaching age 100, and consequently Transamerica has liability to pay death benefits under the policy." (Doc. 57-1 at 25.)

At the hearing, the parties agreed there are no genuine issues of material fact that must be resolved by a jury and therefore the case should be resolved on summary judgment. The parties also agreed that although issue preclusion was originally briefed by the parties, that is no longer an issue in this case. Finally, the parties agreed that Texas and California law should be used to interpret the policy, as will be discussed more fully below. More facts will be discussed as necessary.

## IV.    THE PARTIES' POSITIONS

Transamerica has moved for summary judgment on both of SL3's claims and for declaratory judgment. (Doc. 56-1.) SL3 has moved for partial summary judgment, arguing that the policy is unenforceable for several reasons. (Docs. 57-1; 67.) As alluded to above, the parties' arguments changed during the briefing and hearing process. One reason for these changes was the disposition of *The Lebbin-Spector Fam. Trust v. Transamerica Life Ins. Co.*, which was reversed by the Eleventh Circuit three days after the parties filed their motions for summary judgment. No. 18-CV-80558-MIDDLEBROOKS, 2019 U.S. Dist. LEXIS 1211687 (S.D. Fla July 19, 2019), *vacated, reversed & remanded sub nom. Lebbin v. Transamerica Life Ins. Co.*, No. 20-11756, 2021 WL 3278166 (11th Cir. Aug. 2, 2021) (per curiam). For the most part, the parties assert the same arguments in support of their own motions for summary judgment and in resistance to each other's motions for summary judgment. Therefore, the Court will discuss the issues raised by the parties without reference to a particular motion.

## V.    DISCUSSION

### A.    Choice of Law

Generally, "[t]he validity of a life insurance contract . . . issued to the insured upon his application and the rights created thereby are determined, in the absence of an effective choice of law by the insured, by the local law of the state where the insured was domiciled at the time the policy was applied for. . . ." *Am. Nat'l Ins. Co. v. Conestoga*

*Settlement Tr.,* 442 S.W.3d 589, 598 (Tex. App. 2014) (quoting Restatement (Second) of Conflict of Laws § 192 (Am. Law Inst. 1971)) (emphasis omitted). "Essentially, in the absence of an effective choice of law by the insured, Section 192 creates a choice of law presumption in favor of the jurisdiction where the insured was domiciled at the time he or she applied for life insurance." *Id.* (citing Restatement § 192).

Mr. and Mrs. Barnett were domiciled in Texas at the time they applied for the life insurance policy at issue in this case, which means Texas law would normally apply to this case. (*See* Doc. 56-3 at 22, 25-26.) However, this case was originally filed in the Central District of California and venue was transferred to this Court. (Doc. 1.) Accordingly, this Court must apply the same law as would the Central District of California because "the transferee district court is obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964); *Thorn v. Int'l Bus. Machs., Inc.*, 101 F.3d 70, 72-73 (8th Cir. 1996) (same).

In California, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646. A contract "indicate[s] a place of performance . . . if the contract expressly specifies a place of performance or if the intended place of performance can be gleaned from the nature of the contract and its surrounding circumstances." *Frontier Oil Corp. v. RLI Ins. Co.,* 63 Cal. Rptr. 3d 816, 821 (Cal. Ct. App. 2007) (brackets in original). This is determined "at the time [the parties] entered into the contract." *Id.* at 826. Because most insurance policies do not expressly state a single place of performance or a choice of law, a California court interpreting an insurance contract customarily applies the law of "the place where it was made" which is the domicile of the insured at the time of application. S*ee, e.g., West Am. Ins. Co. v. Nutiva, Inc.*, No. 17-cv-03374-HSG, 2018

WL 3861832, at *3 (N.D. Cal., Aug. 14, 2018) ("Courts have rejected broad readings of § 1646 that would render superfluous the 'place where it is made' prong"); *Evanston Ins. Co. v. On Point Events LP*, No. CV 09-705-VBF(CTx), 2009 WL 10674304, at *3, (C.D. Cal., Sept. 22, 2009) (applying Texas law because insurance policy was delivered to and accepted by insured in Texas).

The policy does not contain a choice of law provision and states no single place of performance. Ben and Betty Barnett lived in Texas; the policy was signed for the company "at Los Angeles, California;" and the policy states that Los Angeles, California is the address of Transamerica's home office.[6] (Doc. 56-3 at 1, 24-26.) The policy provides for some performance in California and some in Texas, i.e., both parties have obligations. The policy was delivered to and accepted by the Barnetts in Texas. Under these facts, the insurance contract was made in Texas. *See Evanston Ins. Co.*, 2009 WL 10674304, at *3 (Texas law applied when insurance policy delivered to and accepted by insured in Texas); *Ameron Int'l Corp. v. Am. Home Assur. Co.*, No. CV 11-1601 CAS (AGRx), 2011 WL 2261195, at *5 (C.D. Cal. June 6, 2011) (applying California law to insurance contract that did not state place of performance and policies were delivered to and accepted by plaintiff in California); *West Am. Ins.,* 2018 WL 3861832, at *3.

Consequently, Texas law controls under California's choice of law rules. At the hearing, the parties agreed that Texas law controls, with consideration of California law, in spite of the fact that SL3 cited authority from several different states in its briefs.[7]

---

[6] Transamerica denies that it was headquartered or incorporated in California at the time the policy was written because Transamerica is an Iowa corporation. (Doc. 66-1 at 5 ¶ 8 Response.)
[7] SL3 asserts that California holds that there is no conflict of law between California and Texas rules of contract interpretation. (Doc. 65 at 14) (citing *Int'l Serv. Ins. Co. v. Gonzales*, 194 Cal. App.3d 110, 116 (1987) ("Even assuming the trial court applied Texas law, we do not identify a conflict of law problem . . . the laws of the two states are the same, no conflict exists."). The Court finds that SL3 reads *Int'l Serv. Ins.* too broadly. The case does not stand for the proposition that California and Texas have identical contract interpretation rules, but only that interpretation of the clauses at issue in that case would be the same under the rules of either state. The Court

**B.**     ***The Parties' Substantive Arguments***

SL3 claims Transamerica breached the insurance contract by impermissibly cancelling policy coverage prior to Betty Barnett's one hundredth birthday or death. (Doc. 50 ¶ 15.)  SL3 argues that the policy was "incomprehensible" and ambiguous when analyzed using proper contract interpretation rules. (Doc. 65 at 22-27.)  Specifically, SL3 asserts that (1) Transamerica improperly relies on extrinsic evidence to make arguments about policy interpretation (*Id.* at 21); (2) SL3 is not a sophisticated party (*Id.* at 19-20); (3) the Eleventh Circuit's *Lebbin* decision should not be followed by the Court for several reasons.   (Doc. 67 at 3-4); (4) the policy does not provide a succinct definition of "maturity date" (Doc. 65 at 25-26); (5) the policy does not sufficiently define "joint equal age" or provide "any definitive explanation for what is 'equal' about the meaning of 'Joint Equal Age 74' and/or 'Joint Equal Age 100' or how the two very different, unusual and technical phrases interact or apply" (*Id.* at 26-27); (6) the policy defines and discusses "Cash Value" and "Accumulation Value" in a "circular manner with unintelligibly complex and convoluted discussion" (*Id.* at 27); and (8) SL3 does not seek reformation of the policy (*Id.* at 20-21).

For its part, Transamerica argues (1) SL3's claims are barred by that statute of limitations (Doc. 56-1 at 20-22); (2) it is not introducing extrinsic evidence to aid the Court in interpreting the policy's terms, but rather to show SL3's "sophistication and due diligence protocols followed when purchasing the [p]olicy," which shows that SL3 is not entitled to "favorable insured construction rules" (Doc. 66 at 4-5); (3) SL3 is a sophisticated purchaser of life insurance policies and therefore is not entitled to the protections afforded the average policy purchaser (Doc. 56-1 at 7-8); (4) the Court should apply *Lebbin* to the policy and grant its motion for summary judgment (Doc. 59 at 9-12;

---

need not, however, decide if the rules of the two states are identical because only Texas contract interpretation rules will be used to interpret the policy language at issue in this case.

Doc. 66 at 2-3); (5) although SL3 seeks reformation of the policy based on ambiguity, the terms "joint equal age" and "maturity date" are unambiguous (Doc. 56-1 at 16-18; Doc. 59 at 12-17; Doc. 66 at 1-2); and (6) at all relevant times, SL3 was on notice about the policy's terms, including its maturity date (Doc. 56-1 at 8-11; Doc. 59 at 3-9, 13-16).

The Court will address the parties' arguments in the most efficient order.

### 1.    Whether the Statute of Limitations Bars SL3's Claims

Transamerica asserts, and SL3 does not contest, that a four-year statute of limitations applies to SL3's claims.  (Doc. 56-1 at 21 (citing Tex. Civ. Prac. & Rem. Code § 16.004; Tex. Bus. & Com. Code § 2.725).)  Transamerica argues that SL3's breach of contract and related declaratory judgment claims are barred by the statute of limitations because any claims SL3 has accrued when the policy was initially issued and first went into effect on January 27, 1994.  (*Id.* at 22.)  SL3 responds that the statute of limitations does not bar its claims because under Texas law the statute of limitations in a breach of insurance contract case "commences only at actual breach, when the insurer denies a claim, and cannot start until the insured demands payment of benefits."  (Doc. 65 at 18 (citing *In re State Farm Mut. Auto. Ins. Co.*, 614 S.W. 3d 316, 355 (Tex. App. 2020).)

SL3 is correct.  In Texas, the statute of limitations on a breach of contract claim does not begin to accrue until the insurance company denies an insured's claim. *See Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990) (holding that a plaintiff's cause of action accrued on day insurance company wrongfully denied coverage and reasoning that "a cause of action generally accrues at the time when facts come into existence which authorize a claimant to seek a judicial remedy") (citing *Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex. 1977)).  The cases cited by Transamerica are not persuasive because they do not apply the Texas statute of limitations. *See Ruddy v.*

14

*Equitable Life Assurance Soc'y of the U.S.*, No. CIV. A. DKC 00-70, 2000 WL 964770, at *3-4 (D. Md. June 20, 2000), *Thelen v. Mass. Mut. Life Ins. Co.*, 111 F. Supp. 2d 688, 690-92 (D. Md. 2000), and *John Q. Hammons Hotels, Inc. v. Acorn Window Sys., Inc.,* 394 F.3d 607, 611 (8th Cir. 2005) (applying Iowa statute of limitations).

     *Jones v. Texaco, Inc.*, 945 F. Supp. 1037 (S.D. Tex. 1996), which Transamerica cites for the proposition that the statute of limitations accrues "from the time of purchase when the injury occurred" can be distinguished from the case at bar and harmonized with the Texas decisions previously cited. *Jones* did not involve the same statute of limitations at issue in this case. Rather, *Jones* involved the statute of limitations applicable to property damage. 945 F. Supp. at 1041 (applying Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a), which provides a two-year statute of limitations for damage to property). Moreover, *Jones* noted that a cause of action does not arise until facts exist that authorize the plaintiff to seek relief. *Id.* at 1042. Finally, *Jones* held that the plaintiffs, who purchased land that was previously a well-known oil "sludge pit," were limited to a two-year statute of limitations beginning at the time of their purchase, even though the pollution began decades prior to that date because the injury was not "inherently undiscoverable" when public deeds the plaintiffs or their representatives would have reviewed during a chain-of-custody review prior to their purchase disclosed that fact. *Id.* at 1043 ("A purchaser of land has constructive notice of all information contained in his grantor's chain of title, and he is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in that chain.") (citation omitted). There is no public record in this case that put the Barnetts on notice regarding interpretation of their insurance policy. The parties admit that at the time the Barnetts signed their policy, there were no cases interpreting the policy language at issue in this case.

In addition, although the parties agree that a four-year statute of limitations applies to breach of contract claims in Texas, the sections of the Texas Code cited by Transamerica are not applicable. Tex. Civ. Prac. & Rem. Code Section 16.004, cited by Transamerica, provides the following:

(a)     A person must bring suit on the following actions not later than four years after the day the cause of action accrues:

    (1)     specific performance of a contract for the conveyance of real property;

    (2)     penalty or damages on the penal clause of a bond to convey real property;

    (3)     debt;

    (4)     fraud; or

    (5)     breach of fiduciary duty.

(b)     A person must bring suit on the bond of an executor, administrator, or guardian not later than four years after the day of the death, resignation, removal, or discharge of the executor, administrator, or guardian.

(c)     A person must bring suit against his partner for a settlement of partnership accounts. . . .

SL3 has not filed a claim for any of these actions. Therefore, Section 16.004 is inapplicable to this breach of contract case.

Tex. Bus. & Com. Code Section 2.725, also cited by Transamerica, is part of Texas's Uniform Commercial Code and provides a four-year statute of limitations in contracts for the sales of goods under the Code. "The sale of an insurance policy does not constitute the sale of 'goods' within the meaning of title 2 of the UCC." *Jones v. CGU Ins. Co.*, 78 S.W.3d 626, 629–30 (Tex. App. 2002) (citing *Bartley v. Nat'l Union Fire Ins. Co.,* 824 F. Supp. 624, 636 (N.D. Tex. 1992) and cases from several other jurisdictions)). Accordingly, this section of the Texas Business and Commerce Code is also irrelevant to the case at bar.

16

Conversely, Tex. Civ. Prac. & Rem. Code Section 16.051, *Residual Limitations Period*, provides, "Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues." This section of the Texas Civil Practice and Remedies Code applies to general breach of contract claims in Texas. *See Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002) (four-year statute of limitations applies to breach of contract claim) (citing Tex. Civ. Prac. & Rem. Code § 16.051); *Upshaw v. Lacado, LLC*, -- S.W.3d --, No. 02-20-00031-CV, 2021 WL 3085757, at *7 (Tex. App. July 22, 2021) (noting four-year statute of limitations).

Therefore, the Court finds that a four-year statute of limitations applies to this case and that SL3's case was timely filed. On December 17, 2019, Transamerica notified LS3 that the policy would mature in January. (Doc. 56-4 at 202.) On April 5, 2020, Betty Barnett died at age 96. SL3 filed suit on October 1, 2020, well within the four-year limitations period based on SL3's theory that Transamerica breached the insurance contract by canceling the contract on January 27, 2020.

### 2. Texas Rules of Contract Interpretation

Under Texas law, "[w]hether a contract is ambiguous is a question of law for the court to decide by looking at the policy as a whole in light of the circumstances present when the contract was entered. . . . Disagreement about a policy's meaning does not create an ambiguity if there is only one reasonable interpretation." *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015) (citing *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)). The Court's analysis is confined to the four corners of the policy. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010).

*Nassar v. Liberty Mut. Fire Ins. Co.* succinctly explained the general rules for interpreting insurance policies under Texas law:

Texas courts are to construe insurance policies "using ordinary rules of contract interpretation." *E.g., Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009). When doing so, courts must "determin[e] the parties' intent as reflected in the terms of the policy itself." *Id.* Courts must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). "[N]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) (quoting *Guardian Trust Co. v. Bauereisen*, 132 Tex. 396, 121 S.W.2d 579, 583 (1938)). "Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (citing *Gilbert*, 327 S.W.3d at 126). If we determine that only one party's interpretation of the insurance policy is reasonable, then the policy is unambiguous and the reasonable interpretation should be adopted. *Id.* (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 459 (Tex. 1997)). Alternatively, if we determine that both interpretations are reasonable, then the policy is ambiguous. *Id.*

> In that event, "we must resolve the uncertainty by adopting the construction that most favors the insured," and because we are construing a limitation on coverage, we must do so "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."

*Id.* (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)).

In contract law, the term "ambiguous" means more than simply "denoting a lack of clarity in language." *Id.* at 119 (citing *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951)). A contract is not ambiguous simply because the parties to a lawsuit offer conflicting interpretations of the contract's provisions. *Id.* (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)). A policy is ambiguous if it is genuinely subject to more than one meaning after applying

the pertinent rules of contract interpretation. *Id.* (citing *Daniel*, 243 S.W.2d at 157; *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998)).

508 S.W.3d 254, 257–58 (Tex. 2017). Courts may use dictionaries to determine the ordinary and generally-accepted meaning of words or phrases that are not defined in insurance policies. *See Anadarko Petroleum Corp. v. Houston Cas. Co.*, 573 S.W.3d 187, 192 (Tex. 2019) ("To determine a term's common, ordinary meaning, we typically look first to dictionary definitions and then consider the term's usage in other authorities.") (citing *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017)). In addition, a contract is not ambiguous merely because a party can identify ways that, in hindsight, contract language could have been more clearly stated. *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 130 (Tex. 2015).

"The [policyholder] has the initial burden to establish coverage under the policy." *Texas Farm Bureau Underwriters v. Graham*, 450 S.W.3d 919, 923 (Tex. App. 2014). All ambiguities in contracts must be construed against the drafter. *FDIC v. Am. Home Assurance Co.*, 585 S.W.2d 756, 759 (Tex. App. 1979). In Texas, it is "firmly established that policies of insurance are interpreted and construed liberally in favor of the insured and strictly against the insurer." *Id.* (citing *Vernon v. Aetna Life Ins. Co.*, 301 F.2d 86 (5th Cir. 1962); *Providence Wash. Ins. Co. v. Proffitt*, 239 S.W.2d 379 (Tex. 1951)). Moreover, "[w]hen an assignee holds a contractually valid assignment, that assignee steps into the shoes of the assignor and is considered under the law to have suffered the same injury as the assignors and have the same ability to pursue the [assignors'] claims. *Shipley v. Unifund CCR Partners*, 331 S.W.3d 27, 28–29 (Tex. App. 2010) (citing *Southwestern Bell Tel. Co. v. Mktg. on Hold Inc.,* 308 S.W.3d 909 (Tex. 2010) (*citing Holy Cross Church of God in Christ v. Wolf,* 44 S.W.3d 562, 572

(Tex. 2001)). "An 'assignment' is simply a transfer of some right or interest." *Id.* (citations omitted).

### 3.    Lebbin v. Transamerica Life Ins. Co., *No. 20-11756, 2021 WL 3278166 (11th Cir. Aug. 2, 2021) (per curiam) and Other Non-binding Precedent*

*Lebbin v. Transamerica Life Ins. Co.* is the only case that has interpreted some of the most-contested language at issue in this case. The Southern District of Florida held in *Lebbin-Spector Family Trust* that two "second to die" insurance policies that terminated on "the policy anniversary nearest Joint Equal Age 100" were ambiguous. 2019 U.S. Dist. LEXIS 121687, at *24. The district court found that the policies, which defined "joint equal age" as "the adjusted age of the Joint Insureds which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status," but failed to define the term "adjusted" were ambiguous "by the incomprehensibility of the term 'Joint Equal Age.'" *Id.* In so holding, the district court rejected Transamerica's suggestion that "adjusted" is a common English word that was used in its ordinary sense in the policies and that a dictionary definition of the word should be used to interpret the contract. *Id.* at *21-22.

The Eleventh Circuit reversed the district court, reasoning that because "adjusted" was not defined in the policy, it was appropriate to look at the ordinary meaning of the word. *Lebbin*, 2021 WL 3278166, at *5 (citing *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291-92 (Fla. 2007)). *Lebbin* adopted a definition from *Merriam-Webster* online that defines "adjusted" as "accommodated to suit a particular set of circumstances or requirements." *Id.*

> In context, then, Joint Equal Age means that the age of the Joint Insureds is accommodated to suit a particular set of circumstances or requirements. *Id.* The particular set of circumstances or requirements here "reflect[ ] a risk that *would be equivalent* to two people of the same age, class of risk and smoking status." Thus, the reasonable interpretation is that Gary's and Bernice's respective ages were adjusted to reflect a single age

to be used when applying the terms of a life insurance policy covering two separate people.

*Id.* (alteration and emphasis in original) (footnote omitted).  Using this definition, *Lebbin* found that the policies terminated "at the policy anniversary nearest Joint Equal Age 100," which meant they would never pay out because the second surviving insured was 103-years-old at the time of the decision.  *Id.* at *1, *5.[8]

### a.     The Parties' Arguments

The parties dispute the persuasiveness of the Eleventh Circuit's *Lebbin* decision. SL3 argues that *Lebbin* is not binding and it is not even persuasive because it is unpublished.  (Doc. 65 at 17 (stating that the "unpublished" is synonymous with "non-precedential") (citing Fed. R. of App. P. 32.1 & advisory committee notes to 2006 adoption).)  SL3 further asserts that *Lebbin* applied Florida law, which is "more relaxed in favor of insurers, less favorable to policy holders and coverage" than the laws of Texas and California, which require insurers to write policies in plain language "used by lay people" and "refusing to limit coverage by complex terms."  (Doc. 65 at 17; Doc. 67 at 3.)

Transamerica counters that, contrary to SL3's argument, unpublished opinions have persuasive value in the Eighth Circuit.  (Doc. 59 at 12 (citing *McDuffee v. United States*, 769 F.2d 492, 494 (8th Cir. 1985) ("Moreover, there is a longstanding practice of this court to follow a ruling of another circuit . . . unless "clearly convinced that it is wrong."); *In re Agriprocessors, Inc.*, No. 15-CV-1015-LRR, 2015 WL 5316867, at *1 (N.D. Iowa Sept. 11, 2015); *Moland v. Bil-Mar Foods*, 994 F. Supp. 1061, 1076 (N.D. Iowa 1998)); (Doc. 66 at 3 n.3 (citing, *inter alia*, 8th Cir. LR 32.1A ("unpublished

---

[8] Because the Eleventh Circuit reversed the holding of *Lebbin-Spector*, 2019 U.S. Dist. LEXIS 121687, at *24, the Court denies as moot Plaintiff's Request to take judicial notice of its holding and apply it to the case at bar.  (Doc. 57-3 at 1-2.)

opinions may be cited 'if the opinion has persuasive value on a material issue and no published opinion of this court or another court would serve as well'"); *White v. Nat'l Football League*, 756 F.3d 585, 594-95 (8th Cir. 2014))). Therefore, Transamerica asserts that because *Lebbin* is the only precedent interpreting "joint equal age," this Court should follow that precedent and decide this case in concert with *Lebbin*. (Doc. 59 at 2; Doc. 66 at 3.)

> ### b. Whether the Court can Consider **Lebbin** *when Deciding this Case*
>
> ### i. *Citation to Unpublished Cases and Cases from Other Jurisdictions*

Transamerica is correct that the Eighth Circuit does not forbid citation to unpublished cases. Eighth Circuit Local Rule 32.1A provides that "unpublished opinions of the Eighth Circuit may be cited 'if the opinion has persuasive value on a material issue and no published opinion of this court or another court would serve as well.'" Although not an opinion from the Eighth Circuit, the guidance from the Circuit summarizes the value of *Lebbin*. The parties agree that *Lebbin* is the only decision interpreting a key provision of the policy before the Court. Moreover, the Eighth Circuit is not opposed to following decisions of other courts and has done so for over 100 years. *See Homan v. United States*, 279 F.2d 767, 773 (8th Cir. 1960) ("We have in a long line of opinions declared that, on an unsettled question of federal law, while a decision by another Court of Appeals is not compulsively binding upon us, we will, in the interest of judicial uniformity, accept it as persuasive and follow it, unless we are clearly convinced that it is wrong.") (citing *Bright v. Arkansas*, 249 F. 950, 952 (8th Cir. 1918); *New Amsterdam Cas. Co. v. Iowa State Bank*, 277 F. 713, 716 (8th Cir. 1921); *Hennepin Cnty., Minn. v. M. W. Savage Factories,* 83 F.2d 453, 456 (8th Cir. 1936); *Guar. Trust Co. of New York v. Henwood*, 98 F.2d 160, 163 (8th Cir. 1938)*; United States v. Blosser*, 104 F.2d 119, 121 (8th Cir. 1939); *Grain Belt Supply Co. v. Comm'r*, 109 F.2d 490, 492 (8th Cir.

22

1940); *Martyn v. United States*, 176 F.2d 609, 610 (8th Cir. 1949); *Birmingham v. Geer*, 185 F.2d 82, 85 (8th Cir. 1950); *Prewett v. Comm'r*, 221 F.2d 250, 252 (8th Cir. 1955); *Comm'r of Internal Revenue v. Moran*, 236 F.2d 595, 596 (8th Cir. 1956); *Goodenow v. Comm'r*, 238 F.2d 20, 22 (8th Cir. 1956); *Cosentino v. Local 28*, 268 F.2d 648, 652 (8th Cir. 1959)). The Eighth Circuit also relies on unpublished cases from other jurisdictions. *See, e.g.*, *Taylor v. Cottrell, Inc.*, 795 F.3d 813, 819–20 (8th Cir. 2015) (relying on, *inter alia*, *Kaplan v. Hanover Ins. Co.*, No. 09–ADMS–10010, 2009 WL 3069004, at *2 (Mass. App. Ct. Sept. 21, 2009) to reverse trial court's decision to exclude expert witness testimony); *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598 (8th Cir. 2002) (quoting *Gordon v. Buntrock,* No. 00–CV–303, 2000 WL 556763, at *4 (N.D. Ill. Apr. 28, 2000) to establish that "in enacting the [Securities Litigation Uniform Standards Act], Congress did not make class actions on behalf of 'nonsellers' and 'nonpurchasers' removable to federal court"). Both *Taylor* and *Gordon* note that they were not selected for publication in regional reporters.

Texas civil appellate courts also allow citation of unpublished decisions. Rule 47.7(b) of the Texas Rules of Appellate Procedure states that only "[o]pinions and memorandum opinions designated 'do not publish' under these rules by the courts of appeals prior to January 1, 2003 have no precedential value but may be cited with the notation, '(not designated for publication).'" Even an opinion erroneously labeled as "not designated for publication" after that date will not lose its precedential value because of the erroneous designation. *Id.* The comment to a 2008 change to the rule states the following:

> Effective January 1, 2003, Rule 47 was amended to prospectively discontinue designating opinions in civil cases as either "published" or "unpublished." Subdivision 47.7 is revised to clarify that, with respect to civil cases, only opinions issued prior to the 2003 amendment and affirmatively designated "do not publish" should be considered "unpublished" cases lacking precedential value. All opinions and

memorandum opinions in civil cases issued after the 2003 amendment have
precedential value.

The rule allows citation to unpublished opinions "even if they are of no precedential value
. . . to afford parties more flexibility in pointing out the reasoning employed in such
opinions rather than simply arguing, without reference, the same reasoning." *State v.
Mechler*, 123 S.W.3d 449, 452 n.5 (Tex. App. 2003) (citation omitted).

Moreover, Texas appellate courts rely on cases from other jurisdictions in their
opinions. *See, e.g.*, *New Texas Auto Auction Servs., L.P. v. Gomez De Hernandez*, 249
S.W.3d 400, 405–06 (Tex. 2008) (agreeing with courts in other jurisdictions that
auctioneers are not subject to section 402A of the Second Restatement of Torts) (citing
*Pelnar v. Rosen Sys., Inc.,* 964 F. Supp. 1277, 1281 (E.D. Wis. 1997); *Antone v.
Greater Ariz. Auto Auction*, 155 P.3d 1074, 1079 (Ariz. Ct. App. 2007); *Musser v.
Vilsmeier Auction Co.*, 562 A.2d 279, 283 (Pa. 1989); *Brejcha v. Wilson Mach.,
Inc.,* 206 Cal. Rptr. 688, 694 (1984); *Tauber–Arons Auctioneers Co. v. Super. Ct.,* 161
Cal. Rptr. 789, 798 (1980)); *Westgate, Ltd. v. State*, 843 S.W.2d 448, 453 (Tex. 1992)
(relying on precedent from other jurisdictions in deciding a case of first impression for
the Texas Supreme Court: "Other jurisdictions have likewise concluded that publicly
targeting a property for condemnation, resulting in economic damage to the owner,
generally does not give rise to an inverse condemnation cause of action unless there is
some direct restriction on use of the property.") (citing *Kirby Forest Indus. v. United
States*, 467 U.S. 1, 14–16 (1984); *Littman v. Gimello*, 557 A.2d 314 (N.J. 1989); *Hood
v. Chadick*, 615 S.W.2d 357 (Ark. 1981); *Sproul Homes of Nev. v. State*, 611 P.2d 620
(Nev. 1980); *Chicago v. Loitz*, 329 N.E.2d 208 (Ill. 1975); *Orfield v. Housing & Redev.
Auth.*, 232 N.W.2d 923 (Minn. 1975); *Empire Constr., Inc. v. City of Tulsa*, 512 P.2d
119 (Okla. 1973); *Bakken v. State*, 382 P.2d 550 (Mont. 1963)); *Steele v. McDonald*,
202 S.W.3d 926, 928–29 (Tex. App. 2006) ("Consistent with [cited] authorities, we hold

that Gene may not prosecute this appeal *pro se* in his capacity as Independent Executor of the Duke Estate.") (citing cases from 11 state and federal jurisdictions). Importantly, the Texas Supreme Court also cites unpublished decisions from other jurisdictions in its decisions. *See, e.g.*, *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 927-29 (Tex. 2010) (discussing shareholder claims and citing, *inter alia*, *WM High Yield Fund v. O'Hanlon,* No. 04–3423, 2005 WL 1017811, at *12–13, 2005 U.S. Dist. LEXIS 33569, at *41–42 (E.D. Pa. Apr. 29, 2005); *Newby v. Enron Corp.* (*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*), No. MDL–1446, 2007 WL 789141 at *11, 2007 U.S. Dist. LEXIS 17374 at *45–46 (S.D. Tex. Mar. 12, 2007)).

Accordingly, there is no impediment based on Court rules or Texas appellate courts' use of non-published cases or cases from other jurisdictions to this Court considering *Lebbin* as persuasive non-binding authority when deciding the instant case.

### ii. *Whether Texas and Florida Have Different Rules of Contract Interpretation*

SL3 asserts that *Lebbin* applied Florida law, which is "more relaxed in favor of insurers, less favorable to policy holders and coverage" than the laws of Texas and California, which require insurers to write policies in plain language "used by lay people" and "refusing to limit coverage by complex terms." (Doc. 65 at 17; Doc. 67 at 3.) SL3 bases this argument on a line from *Lebbin* that notes that in Florida, "[a] provision [of an insurance policy] is not ambiguous 'simply because it is complex and requires analysis.'" SL3 contends that this language is more favorable to insurers than the law this Court must use to interpret the policy. (Doc. 67 at 3) (citing California law requiring policy language to be "stated precisely and understandably, in words that are part of the working vocabulary of the average layperson.") (quoting *Marentes v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 909–910 (N.D. Cal. 2016)). SL3 also asserts that California law treats "the unexpected nature of an exclusion as an independent and

sufficient reason for striking the exclusion" and will not allow enforcement of "a limiting provision not placed and printed so that it will attract the reader's attention or where terms are contrary to ordinary usage." (*Id.* at 3-4 (citations omitted).)

I will address each of SL3's arguments in turn, but first note that, as discussed above, Texas law controls my analysis of this policy, with *consideration* of California law. Although the parties seem to agree the laws of the two states are in harmony, I will continue to first rely on Texas law. *See Evanston Ins. Co*, 2009 WL 10674304, at *3 (applying Texas law because insurance policy was delivered to and accepted by insured in Texas).

Texas does not specifically require the use of plain English in insurance policies, although it encourages it. "Texas law . . . requires that insurance policies be written in English, preferably plain English, not code." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.,* 242 S.W.3d 1, 13 (Tex. 2007); *Daimler Chrysler Ins. Co. v. Apple*, 265 S.W.3d 52, 66 n.17 (Tex. App. 2008) (same), *aff'd in part, rev'd in part sub nom. on other grounds by Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248 (Tex. 2009). It appears that Florida has the same preference and, like Texas, does not have a specific "plain English" requirement for its insurance policies. However, Florida courts have decided cases in favor of insureds when policies did not state exclusions in "plain English." *See, e.g.*, *Nixon v. U. S. Fid. & Guar. Co.*, 290 So. 2d 26, 29 (Fla. 1973) (holding that if insurer had no intention of defending against a negligence action, it should have said so "in plain English"); *Aetna Ins. Co. v. Stevens*, 229 So. 2d 601, 602 (Fla. Dist. Ct. App. 1969) (same).

When interpreting insurance policies, Texas requires that "[u]nless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning. . ." *RSUI Indem. Co.*, 466 S.W.3d at 118. Similarly, Florida, requires that "[w]ords and phrases in an insurance policy, when not specifically defined

therein, must be given their everyday meaning and read in light of the skill and experience of ordinary people." *Siegle v. Progressive Consumers Ins. Co.*, 788 So. 2d 355, 360 (Fla. Dist. Ct. App. 2001) (quotation omitted), *approved*, 819 So. 2d 732 (Fla. 2002). This rule is almost identical to the Texas rule. In fact, *Siegle* noted that Texas's contract interpretation rules are "akin to those used in Florida" when it relied on a case from the Texas Court of Appeals interpreting the same limitations provision at issue in *Siegle* to interpret the word "repair" in the way an ordinary person would generally understand the term. *Id.* (relying on *Carlton v. Trinity Universal Ins. Co.,* 32 S.W.3d 454, 456-57, 464-65 (Tex. App. 2000)). Moreover, in concert with general rules of contract interpretation, both Texas and Florida interpret ambiguous contract terms against the drafter. *See Am. Home Assur. Co.*, 585 S.W.2d at 759; *see also Lebbin*, 2021 WL 3278166, at *4. Therefore, Texas and Florida appear to be, in the words of *Siegle*, "akin" to each other regarding contract interpretation. 788 So. 2d at 360.

I further find that SL3 misinterprets *Lebbin*'s statement that "[a] provision [of an insurance policy] is not ambiguous 'simply because it is complex and requires analysis." Contrary to SL3's assertion, this statement does not mean that Florida contract interpretation rules are more favorable to insurers than the rules the Court must apply in this case.

"Analysis" is defined as "a careful study of something to learn about its parts, what they do, and how they are related to each other." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/analysis (last visited Nov. 29, 2021). This is consistent with the process of applying the rules of contract analysis to "learn more about" the meaning of particular contract terms, "or parts," or the application of certain contract provisions to the facts of a case.

*Lebbin* applied the Florida rules of contract analysis to determine the meaning of the word "adjusted," which was not defined in the policy. 2021 WL 3278166, at *5.

The *Lebbin* panel began this process by looking up "adjusted" on *Merriam-Webster* online and applying that definition in context. *Id.* *Lebbin* next checked the definition to ensure that "[o]ther provisions in the Policies support[ed] this interpretation." *Id.* *Lebbin* found that other policy provisions did, indeed, support its interpretation when reading the relevant policy provisions together. *Id.* (citing *Triple E Dev. Co. v. Floridagold Citrus Corp.*, 51 So. 2d 543, 438-39 (Fla. 1951) (en banc)). Thus, *Lebbin* ended the process there.

Likewise, *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288 (Fla. 2007), the case upon which *Lebbin* relies for the statement that policies are not ambiguous merely because they are complex or require analysis, used dictionary definitions of certain terms and the Florida Supreme Court's and other jurisdictions' interpretations of similar language to interpret disputed insurance contract terms. *Id.* at 292-93. Thus, *Garcia* concluded that the policy at issue did not cover a personal liability award against a policy owner's employee who sought coverage under the policy.

*Garcia*, itself, relied on *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.,* which further explained Florida's rules of contract interpretation as follows:

> [E]xclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured, since it is the insurer who usually drafts the policy. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So. 2d 938, 942 (Fla.1979). However, "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the rule apposite. It does not allow courts to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.*

28

*Id.*[9] at 1248; *see also Deni Assocs. of Florida, Inc. v. State Farm Fire & Casualty Ins. Co.,* 711 So.2d 1135, 1138 (Fla. 1998) (following *Pridgen* rule for interpretation of exclusionary clauses). Notably, simply because a provision is complex and requires analysis for application, it is not automatically rendered ambiguous. *See Eagle American Ins. Co. v. Nichols*, 814 So.2d 1083, 1085 (Fla. 4th DCA 2002). Finally, we have consistently held that "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto–Owners,* 756 So.2d at 34; *see also* § 627.419(1), Fla. Stat. (2002) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto.").

In *State Farm Fire & Casualty Co. v. CTC Development Corp.,* 720 So.2d 1072 (Fla.1998), we reasoned, "The lack of a definition of an operative term in a policy does not necessarily render the term ambiguous and in need of interpretation by the courts." *Id.* at 1076.

845 So. 2d 161, 165-66 (Fla. 2003) (alterations, except for footnote, in original). *Swire Pacific Holdings* held that the policy term at issue was not ambiguous based on the terms of the contract without conducting any other analysis and went on to apply that term to the facts of the case. *Id.* at 166.

Nothing in the way the Florida courts conducted the above legal analyses leads me to conclude that Florida's contract interpretation rules are more insurer-favorable than the Texas rules of contract interpretation. In the cases discussed above, the courts conducted ordinary contract interpretation employing the same rules as Texas courts would employ. Nothing in the courts' use of the rules or application of law to fact indicated a pro-insurer bias. Moreover, SL3 does not cite any Florida case that so indicates.

---

[9]*Id.* refers to *State Farm Mutual Automobile Insurance Co. v. Pridgen*, 498 So.2d 1245 (Fla.1986).

Accordingly, I find that Florida's rules of contract interpretation are not more insurer-favorable than those employed in Texas. I further find that Texas allows the use of precedent from other jurisdictions when there are no binding cases to guide the Court.

### 4. Whether SL3 Seeks Reformation of the Policy

Transamerica asserts that SL3 seeks reformation of the policy to which it is not entitled.[10] (Doc. 56-1 at 18 (citing, *inter alia*, *Oldaker v. Travelers Ins. Co.*, 497 S.W.2d 402, 404 (Tex. Civ. App. 1973) (holding no reformation of an insurance contract where mistake as to coverage is unilateral). SL3 responds that it is not seeking reformation of the policy. (Doc. 65 at 20-21.) Therefore, this issue is moot and need not be further discussed.

### 5. Whether the Policy is Ambiguous

My analysis begins with the four corners of the policy. *See Page*, 315 S.W.3d at 527. If I determine the policy is not ambiguous on its face, my analysis is complete and I need not consider extrinsic evidence. *See Nassar*, 508 S.W.3d at 257–58 ("A policy is ambiguous if it is genuinely subject to more than one meaning *after* applying the pertinent rules of contract interpretation.") (emphasis added) (citation omitted).

SL3 asserts that (1) the "surprising and hidden meaning given to 'Maturity Date,'" (2) "the absence of any explanation for what is 'equal' about the meaning of 'Joint Equal Age 74' and/or 'Joint Equal Age 100' or how 'those two very different, unusual, and technical phrases interact or apply,'" and (3) "the circular manner in which the policy defines and discusses 'Cash Value' and 'Accumulation Value' with use of 'unintelligibly complex and convoluted discussion'" all render the policy ambiguous. SL3 argues that it, or any policy holder,

---

[10] Transamerica's argument is somewhat rhetorical. That is, Transamerica seems to be arguing that if the Court interprets the insurance agreement in SL3's favor it would essentially work a reformation of the policy.

would have to fully understand all these terms and their interrelationship to realize that all coverage and benefits would be lost after paying decades of large premiums if either insured lived to 96 rather than to age 100 or longer, despite virtually all other life insurance policies rewarding policy holders with benefits for living to maturity of the policy.

(Doc. 67 at 4.)

Transamerica responds that terms SL3 claims are ambiguous are clear. (Doc. 56-1 at 16-18; Doc. 59 at 3-9; Doc. 66 at 5.) I will address the parties' individual arguments, in turn.

### a. Maturity Date

SL3 argues that it

had no idea the maturity of its policy could happen years prior to either insured reaching age 100, or that maturity would cause a loss of coverage as well as any meaningful cash value, contrary to the ordinary meaning of the word "maturity" as used in insurance policies. Plaintiff's manager had never heard of "Joint Equal Age" wording previously and had no idea such wording could cause an early loss of benefits. Instead of discussing this evidence, Transamerica merely references policy illustrations it sent; however, even Transamerica's own illustrations and policy verification listed the maturity date as "unknown" or as already passed, further confusing the situation. (F35.) None of this hinted, much less made clear, that policy maturity would cause a near complete and catastrophic loss of benefits, in contrast to the ordinary meaning and effect of "maturity" with a life insurance policy where benefits are realized. (See Plaintiff's Request for Judicial Notice and App. at 67.)[11]

(Doc. 65 at 22.) SL3 further explains that the policy's "unusual 'Joint Equal Age'" wording is not in the definitions section of the policy, but rather on page 16 in the Termination of Insurance clause. (Id. at 24.) In short, SL3 argues that it was "shocked"

---

[11] "F" is SL3's abbreviation for its Statement Material Facts and Statement of Additional Material Facts. (Docs. 57-2, 61-1.) F35 refers to the fact found at ¶ 35. "App." is SL3's abbreviation for its Appendix. (Docs. 57-4 & 61-4.)

to learn that Transamerica claimed the policy matured prior to actual age 100 with no substantial benefits payable.  (*Id.* at 22.)

Transamerica contends that SL3 had ample notice both before and after it acquired the policy of when and how the policy matured.  Specifically, Transamerica notes that SL3 had access to the policy and its terms, "including the Barnetts' Amendment to the Policy's Application clarifying that, despite their age of 70, the Policy was 'issued at . . . joint equal age 74." (Doc. 56-1 at 10, 16 (ellipses in original) (capitalization omitted) (citations omitted).)   Transamerica further states that The Policy Data Page of the Application Amendment also stated: "Maturity Date: policy anniversary date nearest the insureds' joint equal age 100." (*Id.* at 16 (citing Docs. 56-2 at 2 ¶ 3; 56-3 at 3) (capitalization omitted).)  Transamerica directs the Court to the following language from the first paragraph of the policy: "While the policy is in force, Transamerica. . . will pay the death benefit to the beneficiary if both Joint Insureds die before the Maturity Date, or will pay the net cash value, if any, to the owner on the Maturity Date if both or either Joint Insured is living on that date." (Doc. 56-3 at 1.)  Transamerica points out that on page 2 of the policy, these policy provisions are spelled out again in the Policy Summary: "We will pay the death benefit to the Beneficiary if both Joint Insureds die before the Maturity Date." (Doc. 66 at 5 (quoting Doc. 56-3 at 2).)

Transamerica asserts that the policy terms were clear an unambiguous "and should be enforced accordingly" because "everyone—the Barnetts, Transamerica, and SL3— knew, acknowledged, and were on full notice" regarding the meaning of the policy's terms.   (Doc. 56-1 at 17 (emphasis omitted) (citation omitted); Doc. 59 at 4-7.) Transamerica argues that despite being aware of the policy's terms, SL3 focused on Betty Barnett's life expectancy instead of the policy terms when deciding whether to purchase the policy and ignored the policy's maturity date after acquiring the policy.  (Doc. 56-1

at 18.)  Transamerica argues that SL3 should not be rewarded for its inattention to the clear terms of the policy.

SL3 responds that the policy does not provide a succinct definition of "maturity date," and instead of assigning the term its common meaning, combines "a minimal definition at page four of [the policy] with a subsequent discussion of the phrase with 'Termination' at page 16, [which] is "an unexpected limitation on coverage that is not plain and clear; therefore, it is not enforceable under Texas . . . law." (Doc. 67 at 2.) SL3 notes that the policy does not include an "actual calendar date for maturity," or define the maturity date, the date of termination or cancelation, instead providing that the maturity date was "'the policy anniversary nearest the Insureds' Joint Equal Age 100.'" (Doc. 57-1 at 22.)  SL3 states that "[t]he ordinary meaning of a life insurance maturity date is when the insured has reached an age where, without death, the policy benefits are paid out." (Doc. 65 at 25.)  In fact, SL3 asked the Court to take judicial notice of this definition.  (Doc. 57-3 at 2.)  SL3 asserts that "[i]n normal usage, maturity and termination of a life insurance policy are drastically different concepts." (Doc. 65 at 26.) According to SL3, Transamerica's construction is both misleading and surprising, not only to a layperson, but also to an insurance expert.  (*Id.*)  SL3 specifically contends that

> None of the policies defined "Maturity Date" to state it meant the insurance expired, canceled, ended, or lapsed, even though the ordinary meaning of the phrase "maturity date" is for benefits to become immediately payable or for premiums to cease, both positive events, rather than the negative event of losing benefits. (See Plaintiff's Request for Judicial Notice and App. at 67.) Instead, all of the policies stated, ten to twelve pages after the definitions, that the "policy will terminate at the earliest of the following dates: (1) the date of surrender; or (2) the policy anniversary nearest Joint Equal Age 100 . . ." None stated any specific date or explained how to calculate the adjusted "Joint Equal Age 100."

(Doc. 57-1 at 12-13 (ellipses in original).)

33

SL3 also contends that the first page of the policy makes all of this even more confusing because it "suggests coverage does not end prior to the death of the second insured, remaining in force throughout the life of the survivor, by stating in bold print that the policy had 'Flexible Premiums During Life of the Survivor of the Joint Insureds.'" (Doc. 65 at 26.) SL3 also takes issue with the fact that the policy does not state an actual calendar date for maturity. (Doc. 57-1 at 22.)

"It is the settled law in [Texas] that contracts of insurance in their construction are governed by the same rules as other contracts, and that terms used in them are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows them to have been used in a technical or different sense." *Western Rsrv. Life Ins. Co. v. Meadows*, 261 S.W.2d 554, 557 (Tex. 1953) (citations omitted); *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.,* 490 S.W.3d 20, 23 (Tex. 2015) ("The interpretation of an insurance policy, like other contracts, begins with the text, and requires that undefined words be given their plain, ordinary, and generally accepted meanings absent some indication of a different intent.") (citations omitted); *see also* Restatement (Second) of Contracts § 202(3)(a) (1981) ("Unless a different intention is manifested, where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."); 2 Couch on Insurance, § 22:57, *Variance between custom and usage and contract* (3d ed. Nov. 2021 update) ("If the contract is stated in clear, positive, and unambiguous terms, usage or custom cannot be permitted to vary or contradict the terms used.") Under Texas law, "the paramount rule is that courts enforce unambiguous policies as written." *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 514 F. Supp. 3d 896, 903 (W.D. Tex. 2021) (citing *Pan Am Equities, Inc. v. Lexington Ins. Co.*, 959 F.3d 671, 674 (5th Cir. 2020)).

In *Meadows*, the word "war" was not defined in the phrase "in time of war" in the exclusionary clause of an accidental death policy. 261 S.W.2d at 561. The trial court

and Texas Court of Appeals concluded that the exclusion for a "death in time of war" did not apply to the death of a member of the Army Corps of Engineers who died in a plane crash while working because the United States had never formally declared war against North Korea. *Id.* at 561-62. The Texas Supreme Court disagreed and applied the ordinary meaning of the word to the clause because the parties had not defined the term. *Id.* at 569. After discussing situations in which there "may be war or a state of war without a declaration of war by the department of government clothed in the war-making power," *Meadows* concluded that there was nothing in the policy to suggest "war" was to be given its "technical" or "legal" definition, but rather its generally accepted meaning of "war in fact." *Id.* at 564, 568-69 (citing *Weissman v. Metro. Life Ins. Co.,* 112 F. Supp. 420, 421 (S.D. Ca1. 1953); *Stanbery v. Aetna Life Ins. Co.*, 98 A.2d 134, 137 (N.J. Super. Ct. Law Div. 1953)).

Here, the policy first addresses its maturity date on page 1 in the first paragraph: "While the policy is in force, Transamerica Occidental Life Insurance Company will pay the death benefit to the beneficiary if both insureds die *before* the Maturity Date, or will pay the net cash value, if any, to the owner on the Maturity Date, if either Joint Insured is living on that date." (Doc 56-3 at 1 (emphasis added).) Page 1 also states, in a clearly delineated paragraph in bold print with the following line breaks,

Death Benefit Payable at Death of
Survivor Before the Maturity Date
Net Cash Value, If Any, Payable at
Maturity Date

(*Id.*) Page 2 provides the policy summary, the first paragraph of which states, "We will pay the death benefit to the Beneficiary if both Joint Insureds die before the Maturity Date." (*Id.* at 2.) Page 3 provides policy data and states in all capital letters, "Maturity Date: policy anniversary date nearest the insureds' joint equal age 100." (*Id.* at 3 (capitalization omitted).) The policy issue date was January 27, 1994. (*Id.*)

35

The Definitions Section defines "Maturity Date" as "the policy anniversary nearest the Insureds' Joint Equal Age 100." (*Id.* at 8.) In turn, "Joint Equal Age" is defined as "the adjusted age of a male and female insured which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status." (*Id.*) As discussed above, the policy was issued at a "special class joint equal age 74." (*Id.* at 22.) Ben and Betty Barnett both signed the amendment memorializing the "special joint equal age" provision. (*Id.*) Reasons for Termination of Insurance, including, *inter alia*, the policy reaching the Maturity Date, are listed on page 20 of the policy. (*Id.* at 20.)

The case at bar can be distinguished from *Meadows* because the parties manifested an intention to define "maturity" or "maturity date" in a different way from its generally accepted meaning, assuming SL3 is correct regarding the term's generally accepted meaning. Unlike the term "war" in *Meadows* or the undefined term "adjusted," which was addressed in *Lebbin* and which will be addressed below, maturity date is defined in the policy, not only in the definitions section, but also via use consistent with that definition in various other sections of the policy. Although SL3 takes issue with the placement of the termination provision of the policy pages away from the definitions section, SL3 does not argue that the termination provision is hidden among other provisions or somehow otherwise inaccessible to readers. Nor could it. The termination provision is located in the General Provisions section of the policy. (*Id.* at 19-20.) The provision, itself, is located at the top of a column and the provision heading, "Termination of Insurance – The policy will terminate at the earliest of:" appears to be written in bold type. (*Id.* at 20.) The four bases for termination are clearly delineated by number. (*Id.*)

SL3 is correct insofar as the definition of "Maturity Date" does not provide an exact date when the insurance expired, canceled, ended, or lapsed. Nevertheless, the definition of "Maturity Date" provided in the policy is consistent. SL3 does not argue with the way the term is used or that the way it is used creates inconsistency. And, while

the Court agrees that the policy would have been more clear had it stated that the policy terminated on "'POLICY ANNIVERSARY DATE NEAREST THE INSUREDS JOINT EQUAL AGE 100': 26 years (100 – 74 = 26) years after the Policy issue date of 'Jan 27 1994' [1/27/94 + 26] = January 27, 2020," which is how Transamerica shows the math throughout its briefing in this case (*E.g.*, Doc. 56-1 at 3), this does not mean the maturity date was not included in the policy. *RSUI Indem. Co.*, 466 S.W.3d at 130 (holding that a contract is not ambiguous merely because a party can identify ways that, in hindsight, things could have been more clearly stated).

Courts must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999)). Here, not only is termination defined as "the anniversary date nearest the insureds' joint equal age of 100," which in this case is not hard to calculate because Ben and Betty Barnett were both 70-years-old and both agreed to be considered 74-years-old at the time they signed the policy addendum. (Doc. 56-3 at 22.) Simple math and the progression of time leads to a maturity date of January 27, 2020 as shown above. Moreover, the policy is clear that the death benefit was only payable upon the death of both insureds *before* the Maturity Date. (*Id.* at 1-2.) To the extent that the policy would have matured upon the deaths of the insureds prior to the termination of the policy, those dates, of course, were unknown at the time Ben and Betty Barnett bought the policy. In addition, the Policy Data section of the policy shows the years the policy is in effect. (*Id.* at 5.) The first year shown begins January 27, 1994 and the last year shown begins January 27, 2019. (*Id.*) There is no year beginning January 27, 2020.

The policy defines "maturity date" and uses the term throughout the policy in ways that are consistent with the definition. It makes no difference that the definition in the

policy is different from how maturity date is commonly defined in other policies. *See Meadows*, 261 S.W.2d at 557 (policy terms need not be given their plain, ordinary and generally accepted meaning if the policy intended for them "to have been used in a technical or different sense"). The definition of maturity date is not hidden. Likewise, the termination provisions are not hidden. Accordingly, the Court finds that the meaning of "maturity date" is not surprising and hidden as advanced by SL3. (Doc. 67 at 6.)[12]

### b. *Joint Equal Age and Joint Equal Age 100*

SL3 next argues that the terms "joint equal age" and "joint equal age 100" are ambiguous because they are subject to two reasonable interpretations. (Doc. 57-1 at 23.) SL3 adopts the interpretation the insureds and the district court in *Lebbin-Spector Family Trust* adopted. SL3 argues that the term "joint equal age"

> required Defendant to "adjust" the ages of the insureds before the policy could be terminated and then give notice of that decision. The plain language of the definition for "Joint Equal Age" requires an adjustment that considers the insureds' age, class of risk, and smoking status. There is no proof in the record that Transamerica ever adjusted the Joint Equal Age, or ever updated it, and Transamerica certainly did not give notice of any such adjustment.
>
> The issues caused by the policy's definition of "joint equal age," especially its use of the undefined term "adjusted age," result in conflicting reasonable interpretations of the policy's termination clause. Defendant maintains that it could terminate the contract once a "Joint Equal Age" of 100 was reached, starting from the joint equal age of 74 that was assigned to the Barnett's at the policy's issuance and moving forward one year every year until Joint Equal Age 100. Plaintiff contends that "Joint Equal Age" implicates an "adjusted age," an adjustment that the policy does not define or explain, and which did not occur at any point after the policy was issued and before termination.

---

[12] It follows that Plaintiff's request to take judicial notice of the "ordinary meaning" of maturity date is denied. (Doc. 57-3 at 2.)

If competing interpretations present reasonable alternatives of policy language, the Court must conclude the insurance contract is ambiguous. The Court must then resolve the uncertainty by adopting the construction that most favors coverage, even if the contrary construction appears more reasonable. No one, other than an insurance expert or attorney with prior understanding of this unusual phrase "Joint Equal Age" would have any understanding that the policy coverage would end prior to either insured reaching age 100. The phrase is ambiguous.

If competing interpretations present reasonable alternatives of policy language, the Court must conclude the insurance contract is ambiguous. The Court must then resolve the uncertainty by adopting the construction that most favors coverage, even if the contrary construction appears more reasonable.

(*Id.* at 23-24.)

With one exception, SL3 fairly summarizes the parties' competing interpretations of the terms at issue. SL3 misses one step in the contract interpretation process. A disagreement over the interpretation of an undefined contract term does not automatically render a policy ambiguous. *RSUI Indem. Co.*, 466 S.W.3d at 118 (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex. 2003)). The Court can only find a policy ambiguous after applying the pertinent rules of contract interpretation. *Id.*

### i.    *Adjusted*

Texas courts are encouraged to first look to dictionaries to determine the common meaning of undefined policy terms. *Anadarko Petroleum*, 573 S.W.3d at 192. This is what the Eleventh Circuit did in *Lebbin* when analyzing "adjusted." 2021 WL 3278166, at *5. As discussed above, there is no impediment to using *Lebbin* as persuasive authority.

The use of *Lebbin* is particularly apt in this case because the language at issue is, for all intents and purposes, identical to the language at issue in this case and the insureds' argument regarding the interpretation of "adjusted" is the same. The policy defines "joint

equal age," as "the *adjusted* age of a male and female insured which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status." (Doc. 56-3 at 8 (emphasis added).) This definition is almost identical to the definition of "joint equal age" in *Lebbin*: "the *adjusted* age of the Joint Insureds which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status." 2021 WL 3278166, at *1. The policy in *Lebbin* terminated at the earliest of, in relevant part, "the policy anniversary nearest Joint Equal age 100." *Id.* Again, the policy at bar is strikingly similar, terminating at the earliest of, in relevant part, the maturity date. (Doc. 56-3 at 20.) The maturity date is defined as "the policy anniversary nearest the Insureds' Joint Equal Age 100." (*Id.* at 8.)[13]

The Texas Supreme Court relies on various versions of *Merriam-Webster* dictionaries in its decisions. *See e.g., Powell v. City of Houston*, 628 S.W.3d 838, 844 (Tex. 2021) (quoting Merriam-Webster.com/dictionary); *Texas Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 207 (Tex. 2020) (quoting *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)). Therefore, I find that Texas courts would likely find *Lebbin* persuasive given the lack of authority on the issue and because *Lebbin* is on all fours with this issue. Moreover, this Court would do exactly what *Lebbin* did in this situation and consult *Merriam-Webster* to find the definition of an undefined term because this Court does just that when it looks for definitions. *See, e.g.*, *Galloway v. Kijakazi*, No. 20-CV-00059-CJW, 2021 WL 5278545, at *24 (N.D. Iowa Sept. 2, 2021), *R. & R. adopted*

---

[13] The policies in both cases also paid death benefits only if both joint insureds died "before the policy anniversary nearest Joint Equal Age 100. . . . If both or either Joint Insured is living at the policy anniversary nearest Joint Equal Age 100, we will pay the net cash value, if any, to you." *Lebbin*, 2021 WL 3278166, at *1; (Doc. 56-3 at 1 ("Company will pay the death benefit to the beneficiary if both Joint Insureds die before the Maturity Date or will pay the net cash value, if any, to the owner on the Maturity Date if both or either Joint Insured is living on that date."); 3 (Maturity Date defined as "Policy anniversary date nearest the Insureds' joint equal age 100").)

2021 WL 4399719 (N.D. Iowa Sept. 27, 2021); *Berke v. Saul*, No. 19-CV-4042-MAR, 2020 WL 6827792, at *6 (N.D. Iowa Nov. 20, 2020), *aff'd*, 852 F. App'x 227 (8th Cir. 2021) (unpublished decision).

As *Lebbin* stated, the ordinary, accepted meaning of "adjusted" is "accommodated to suit a particular set of circumstances or requirements." 2021 WL 3278166, at *5; *Merriam-Webster*, https://www.merriamwebster.com/dictionary/adjusted?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited Nov. 17, 2021). This Court agrees with *Lebbin* that using this definition in the context of the policy meant that "the reasonable interpretation is that [Ben and Betty's] respective ages were adjusted to reflect a single age to be used when applying the terms of the life insurance policy covering two separate people." 2021 WL 3278166, at *5 & n.7 ("The understanding that a life insurance policy covering two people must equate the insureds' potentially differing ages into one age is also reflected in the Internal Revenue Code. *Cf.* 26 C.F.R. § 1.7702-2(c) (stating 'the attained age of the insured is determined . . . as if the youngest individual were the only insured under the contract').").

Moreover, *Lebbin* cited the Table of Death Benefit Factors in the policy at issue in that case, in which the "joint equal age attained" was "reflected as a single number to reflect one age for the Joint Insureds." *Id.* Likewise, the policy in this case lists only a single number for "joint equal age attained" in the Table of Death Benefit Factors. (Doc. 56-3 at 10.) The table represents not only age, but also smoking versus non-smoking as factors, which is in concert with the definition of the policy definition of "joint equal age," as "the *adjusted **age*** of a male and female insured which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status." (*Id.* at 8 (emphasis added).) In addition, the Table of Death Benefit Factors stopped at joint equal attained age of 100. (*Id.* at 10.) Not that this is dispositive, but there was room on the page for the column to continue, which, in context, supports that the policy terminated

at joint equal attained age of 100. (*Id.*) The Table of Annualized Guaranteed Monthly Deduction Rates per $1000 also showed that the last year the policy was in effect began January 27, 2019. (*Id.* at 5.)

*Lebbin* can be distinguished from the case at bar because it appears that the insureds in *Lebbin* obtained their policies based on their actual ages. 2021 WL 3278166, at *1. The policy here, however, contained an amendment signed by both Ben and Betty Barnett on February 4, 1994, stating that the policy was issued at a special class joint equal age of 74. (Doc. 56-3 at 22.) Ben and Betty Barnett were each 70-years-old at that time. (*Id.* at 25-26.) Thus, Ben and Betty Barnett's signatures on a separate amendment indicated they understood that they agreed to be treated as if they were four years older than they actually were under the policy. Because this is spelled out in a separate amendment signed by Ben and Betty, it is even more clear here that the insureds were to be treated as one joint equal age starting at joint equal age 74 than it was in *Lebbin*.

For all these reasons, I find that "adjusted" in the policy means that "Ben and Betty's respective ages were adjusted to reflect a single age to be used when applying the terms of the life insurance policy covering two separate people." The single age was special class "joint equal age" beginning at age 74 and represented as a single age throughout the policy. The fact that both insureds, whose actual age was 70, were treated as having a joint equal age of 74 belies SL3's contention that "[t]here is no proof in the record that Transamerica ever adjusted the Joint Equal Age." (Doc. 57-1 at 23.)

Furthermore, contrary to SL3's argument that the policy does not sufficiently define "joint equal age" (Doc. 57-1 at 23-24; Doc. 65 at 26-27) as discussed before, the term is defined in the policy as "the adjusted age of a male and a female insured which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status." (Doc. 56-3 at 8.) The Court has interpreted the word "adjusted" using the rules of Texas contract interpretation, which required the Court to look to a dictionary

42

to find the common ordinary meaning of the word. After doing so, and applying that definition, the Court further found that "joint equal age" meant that "Ben and Betty's respective ages were adjusted to reflect a single age to be used when applying the terms of the life insurance policy covering two separate people."

### ii. Equal

SL3's next argument is that the policy provides "no indication of what is 'equal' about the age or how it is 'adjusted' such as when or how often or in what manner the joint ages are considered. . . . [T]he policy data sheet makes a single reference to 'Joint Equal 74 Age' yet elsewhere the policy never explains this or how it impacts or relates to 'Joint Equal Age 100.'" (Doc. 65 at 26.) SL3 appears to misconstrue the use of the word "equal" in these clauses of the policy. *Merriam-Webster* provides three definitions of "equal" that apply in this case:

**1a(1):** of the same measure, quantity, amount, or number as another

**1a(2):** identical in mathematical value or logical denotation: EQUIVALENT

. . .

**[1]c:** like for each member of a group, class, or society

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/equal (last visited Nov. 27, 2021). As discussed above, the policy unequivocally treated both Ben and Betty Barnett, "each member of the group," if you will, the "same." *Both* were treated alike as members of the group: as if they were each 74, i.e., had lived the same number of years as each other, on the date the policy went into effect. (Doc. 56-3 at 22.) The same is true for "joint equal age 100." As also discussed above, the insureds were treated as one throughout the policy with one "policy year beginning" listed for every year 1994 through 2019 and one "joint equal age attained" listed through age 100. (*Id.* at 5.) Ben and Betty Barnett understood they were agreeing to be treated as though they were each 74 when they bought the policy: They signed a separate amendment that clearly said in

43

capital letters and in a readable font size on a page with very little text that the policy was "issued at a Special Class Joint Equal Age 74." (*Id.* at 22.) As also discussed above, the policy clearly listed the policy years up through joint equal age 100. (*Id.* at 5.) It would be inconsistent with a policy that began with a "special class joint equal age 74" to switch to an "actual age class" without notice. In Texas, as every other jurisdiction in the country, contracts must be read as a whole, *Deepwater Horizon*, 470 S.W.3d at 464, and attempting to impute a new age class into the policy is contrary to that rule.

### iii.    Conclusion

In short, the terms "joint equal age" and "joint equal age 100" are not ambiguous. Joint equal age is defined in the policy. Joint equal age 100 is logically understood in context of the policy that listed the 26 "Policy Year[s]and that commenced at a joint equal age 74 as the product of a simple progression. Moreover, SL3 does not proffer a reasonable interpretation of the term and therefore the policy is not ambiguous. *See Nassar*, 508 S.W.3d at 258 (citation omitted).[14]

### c.    *"Never-heard-of" and "Unusual" Terms*

SL3 also contends that because its manager had never heard the term "joint equal age," SL3 had no idea the term could cause an "early" loss of benefits and that the "unusual 'joint equal age'" wording is combined with "maturity date," which is not defined in the definitions section, but rather, in the Termination Clause of the policy. (Doc. 65 at 22, 24.)

These two points are statements, not arguments. First, the fact that an SL3 manager had never heard the term "joint equal age" does not, in and of itself, make the term ambiguous. Second, as discussed above, "joint equal age," itself, is defined in the

---

[14] Based on the above discussion, the Court need not address SL3's arguments that California treats unexpected exclusions or limiting provisions not placed so as to attract readers' attention as reasons to strike the exclusions or limiting provisions. (Doc. 67 at 3-4.) The exclusions at issue were neither unexpected nor hidden.

definitions section of the policy. (Doc. 56-3 at 8.) The Court has already addressed SL3's arguments related to the policy's definition of "maturity date." These arguments are without merit.

### d.    *Cash Value and Accumulation Value*

SL3's argument regarding these terms touches on arguments regarding all terms it claims are ambiguous:

> "Cash Value" and "Accumulation Value" are defined in a circular manner with unintelligibly complex and convoluted discussion "in the Accumulation Values section." Somehow in all that discussion Transamerica mysteriously transforms payment of cash value at maturity to a minimal payment, as happened when Plaintiff received merely $6,022 despite Transamerica receiving premium payments for over 25 years totaling $610,000. Taken as a whole, as the Court must, the policy is, if not incomprehensible, at least ambiguous. No one – other than an insurance expert or attorney with prior understanding of this unusual phrase "Joint Equal Age" as combined with unusual usage of "Maturity Date" and "Termination" – would have any understanding that the policy coverage would end prior to either insured reaching age 100 with loss of any significant policy benefit.

> Applying the proper rules for insurance policy interpretation, based on Texas and California law . . . the Court should conclude that the policy is not plain, clear, and unambiguous. Instead, the Court should find the policy ambiguous, incomprehensible to an ordinary layperson, and consequently Transamerica breached the policy by imposing a forfeiture of benefits at early maturity prior to the second insured reaching age 100.

(Doc. 65 at 27.)

The Court finds this argument irrelevant to SL3's claims. In its prayer for relief, SL3 asks the Court for the following:

1. A declaration that the Policy did not mature and cancel on January 27, 2020, and instead remained in force as of the date Betty L. Barnett died;
2. Policy benefits of $1,000,000;

45

3. Prejudgment interest, includ[ing] heightened 18% interest under Texas law;
4. Reasonable attorneys' fees under Texas law;
5. Costs; and
6. Other relief as the Court deems proper.

(Doc. 50 at 5.)

SL3 does not seek an adjustment of the cash value it received under the policy. Neither of SL3's claims are related to the way cash value or accumulation value is calculated under the policy. The only damages SL3 seeks under the policy are full death benefits. All other relief is litigation-related relief. SL3 did not even proffer this argument in its motion for summary judgment. Rather, it raised this argument in its resistance to Transamerica's motion for summary judgment. (Doc. 65 at 27.) Accordingly, this argument is irrelevant and, in context, appears to be an attempt to create ambiguity where none exists or, if it does, it is immaterial to the issues at bar. At best, even if true, this evidence is "not significantly probative" of any issue before the Court. *Anderson*, 477 U.S. at 249. Therefore, the Court declines to address this argument.

### C. *Effect of the Court's Findings on SL3's Partial Motion for Summary Judgment*

The foregoing discussion dispatches all the parties' relevant arguments.[15] [16] Although SL3 only sought partial summary judgment, as discussed above, the parties

---

[15] The parties made arguments as to whether SL3 was a sophisticated purchaser of insurance policies. (Docs. 56-1 at 7-8; 59 at 13 (citations omitted); 65 at 20 (citations omitted).) The Court need not address these arguments because the Court's analysis never went beyond the four corners of the policy and the dictionary definitions of words. Whether a party is sophisticated and therefore not entitled to the presumption that drafting ambiguities are construed against the drafter only arises if ambiguity exists "*after* applying pertinent rules of contract interpretation." *Nassar*, 508 S.W.3d at 258 (emphasis added) (citation omitted).

[16] Because the Court has found the policy terms at issue are not ambiguous based on an analysis of the four corners of the policy, the Court need not address the parties' arguments related to documents generated during the negotiation and purchase process regarding the policy's maturity

agreed the case should be decided on summary judgment. In addition, by denying SL3's motion for summary judgment that seeks an order stating that the "policy does not provide for cancelation, termination, or other forfeiture of death benefits prior to one of the insureds reaching age 100, and consequently Transamerica has liability to pay death benefits under the policy," the Court is also denying that "SL3 is entitled to a declaration that the Policy remained in full force and effect at the time of Betty L. Barnett's death." (Doc. 50 ¶ 19.)

## VI.   CONCLUSION

For the reasons set forth herein,

- Defendant's Motion for Summary Judgment **(Doc. 56)** is **GRANTED.**

Transamerica properly administered and otherwise performed the policy at

---

date. The parties, particularly Transamerica, provided the Court with a great deal of information about this process without a clear indication of its relevance. The Court may consider "surrounding circumstances that inform, rather than vary from or contradict, the contract text. Those circumstances include, according to Professor Williston's treatise, 'the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties.'" *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (discussing the parol evidence rule and quoting 11 Richard A. Lord, *Williston on Contracts*, § 32.7 (4th ed. 1999)). The Texas Supreme Court reasons that "[n]egotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole." *Id.* at 469-70 (bracket in original) (quoting *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 781 (Tex. 1977) & citing Restatement (Second) of Contracts § 214 ("negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (c) the meaning of the writing . . . .") (first set of ellipses in original)). However, as noted above in part V.B.2, as Ms. Barnett's assignee, SL3 steps into her shoes and has the same ability to pursue her claims. SL3 does not claim that it was fraudulently induced by Transamerica to accept that assignment or claim the transaction should be rescinded because of SL3's reliance on something Transamerica did or said. Thus, the extrinsic evidence that might be relevant if there was ambiguity would be from the formation of the contract between the Barnetts and Transamerica and not the subsequent assignment. In the absence of such ambiguity, further discussion of this evidence is unnecessary.

issue and does not owe Plaintiff Secondary Life Three any additional benefits under the terms of the policy.

- Plaintiff's Motion for Partial Summary Judgment **(Doc. 57)** is **DENIED.**

- Plaintiff's Request for the Court to take Judicial Notice **(Doc. 57-3)** is **DENIED AS MOOT IN PART AND DENIED IN PART.**

- Because this order disposes of all claims, the Clerk shall enter judgment in favor of Defendant and the trial in this matter shall be canceled.

**IT IS SO ORDERED** this 8th day of December, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

48